UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

THOMAS C. MILLER and DENISE M. MILLER,

      Debtors.

_____/

IRWIN SOLOMON and IRWIN SOLOMON ROTH IRA,

      Plaintiffs,

v.

THOMAS C. MILLER and DENISE M. MILLER,

      Defendants.

_____/

Case No. DT 08-01545
Hon. Scott W. Dales
Chapter 7

Adversary Pro. No. 08-80222

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL</u>

    PRESENT:    HONORABLE SCOTT W. DALES
                    United States Bankruptcy Judge

On May 23, 2008, Dr. Irwin Solomon and the Irwin Solomon Roth IRA filed a Complaint

Objecting to Dischargeability Under 11 U.S.C. § 523 in which they allege that Debtors Thomas

and Denise Miller committed fraud and conversion.[1]  On October 20, 2009, in Traverse City,

Michigan, the court conducted a bench trial and heard testimony from Dr. Solomon, and the

Defendants.  The court admitted 11 exhibits into evidence.

---

[1]In this opinion the court will refer to Dr. Irwin Solomon as "Dr. Solomon" and the Irwin Solomon Roth IRA and any predecessor retirement vehicles as the "IRA."  Collectively, the court will refer to Dr. Solomon and the IRA as the "Plaintiffs."  The court will refer to Thomas Miller as "Mr. Miller" and Denise Miller as "Mrs. Miller." Collectively the court will refer to them as the "Millers" or the "Defendants."

## I.  JURISDICTION

The court has jurisdiction to resolve the issues in this adversary proceeding under 28 U.S.C. § 1334(b), and because the proceeding involves a request to except certain debts from discharge, it qualifies as a core proceeding in which the court may enter final judgment under 28 U.S.C. § 157(b)(2)(I).

This opinion constitutes the court's findings of fact and conclusions of law, in accordance with Fed. R. Civ. P. 52, made applicable by Fed. R. Bankr. P. 7052.  For the reasons that follow, the court will enter judgment for the Defendants.

## II.  THE WITNESSES

Dr. Solomon is a retired podiatrist from the Detroit area who, after meeting Mr. Miller sometime in the late 1980s, invested his own funds, as well as his retirement plan funds, in a series of business ventures inspired and managed by Mr. Miller.  Dr. Solomon was an indulgent and generous creditor, in part because of a personal bond with the Millers, forged by having common struggles as parents of troubled offspring and by travelling in the same social circles.

At the time of trial, Dr. Solomon was 79 years old and was suffering from terminal cancer.  Though at times the Millers impeached Dr. Solomon's recollection of events, they were never able to challenge his veracity.  He truthfully expressed limits on his recollection, and sometimes conceded points that did not necessarily favor his case.  Although his recollection of events was frequently hazy, he was a gentlemanly and eminently credible witness.

Mr. Miller, a 60 year-old, self-styled real estate developer with more entrepreneurial spirit and tenacity than cash, presented himself as an articulate, persuasive, and confident salesman.  His recollection of events was remarkably detailed, and generally consistent with the documentary evidence.  Mr. Miller's testimonial facility could be attributed to his natural

speaking prowess, or his familiarity with the courtroom derived from years as a litigant in various civil and criminal proceedings. Nevertheless, the court credits his testimony and takes him at his word.

Mrs. Miller, slightly younger than her husband, described herself primarily as a wife and mother with limited secondary education, and virtually no involvement in the transactions at issue. By her account, her role was limited to signing documents when and where instructed by her husband and Dr. Solomon, but not reading them. She gave the impression that her husband kept her in the dark about his business dealings. Her involvement was *de minimus*. Dr. Solomon, though testifying that Mrs. Miller signed various documents, largely corroborated her limited role. Mrs. Miller's testimony offended the court not because it was unbelievable, but mostly because it demonstrated a wholesale disregard for the consequences of signing binding documents. Her attitude in this regard offends a lawyer's sensibilities.

### III.  HISTORY OF THE RELATIONSHIP

The following recitation is based on the documentary and testimonial evidence received at trial, and the inferences the court is willing to draw from this information.

The parties met sometime in the late 1980s through a common acquaintance. Dr. Solomon had recently retired from practicing podiatry after suffering a disability from a fused wrist. After amassing a sizeable nest egg in his firm's pension plan,[2] Dr. Solomon found himself with time and money to invest. Knowing this, Mr. Miller approached Dr. Solomon about funding a Burger King franchise in the Detroit area. According to Mr. Miller, he had the time and expertise to run the restaurant, but not enough cash to buy into it. Dr. Solomon came through with the money, and Mr. Miller purchased and operated the restaurant for a few years,

---

[2] He later rolled this into the IRA.

later selling it and returning Dr. Solomon's investment. Thereafter, the parties cooperated in other business ventures including purchasing a video store in suburban Detroit, but that venture did not enjoy much success.

At some point, Mr. Miller pled guilty to federal criminal charges involving the misapplication of funds, presumably from a federally insured or chartered financial institution.[3] While serving time at the Federal Correctional Institution in Milan, Michigan, Mr. Miller had no income to support his family, and again turned to the generosity of his friend, Dr. Solomon. Dr. Solomon advanced $10,000.00 to Mrs. Miller for living expenses while Mr. Miller was incarcerated.

Following a series of less-than-successful ventures, Mr. Miller, individually and through an affiliate called "North American Equities, Inc.," set his sights on developing a 288-acre golf and residential development in Okemos, Michigan, which the parties referred to as the "Governors Club."[4] This project required a considerable outlay of cash, and again Dr. Solomon opened his pocketbook and retirement accounts for the undertaking.

As both parties confirmed in their testimony, the Governors Club project encountered numerous and expensive obstacles, resulting in at least three lawsuits concerning land use regulations and other development-related controversies. The suits were expensive, and the court infers that the other expenses of development prompted Mr. Miller to turn again and again to Dr. Solomon for financial support. It appears Dr. Solomon also turned to some of his other friends, inducing a number of them to participate as lenders or investors.

---

[3] According to Mr. Miller, Dr. Solomon was also part of these proceedings.
[4] The parties also referred to the project as the "Governors Collection."

Mr. Miller credibly testified that he worked for nearly a decade to bring the Governors Club to fruition, but unconsummated sales, the expense and delays associated with the lawsuits, and economic downturns among other factors, caused the project to stall.

A fax letter dated March 30, 2001 (Pl. Exh. 34) from Mr. Miller to Dr. Solomon demonstrates that the parties had begun discussing repayment of "all old loans" and "all more recent loans." The letter also articulates the central role the Governors Club played in Dr. Solomon's repayment. Testimony confirmed that Dr. Solomon and Mr. Miller frequently discussed the project, Dr. Solomon visited the site, and on one occasion he even attended a court hearing regarding one of the project-related lawsuits. At trial, Dr. Solomon conceded that he knew it was important for the Governors Club project to succeed, aware that repayment of the old and newer loans depended upon its success. After reporting in the letter that the project would not be completed for another six or seven years, Mr. Miller, responding to a prior proposal from Dr. Solomon, advised that an aggressive repayment plan "would just not be achievable in the foreseeable future."

Also in his letter, Mr. Miller made no secret of his own financial distress, referring to "four years with zero personal income" and the specter of a personal bankruptcy. Indeed, as the testimony consistently revealed, throughout their relationship Dr. Solomon was aware that the Millers were struggling financially. He helped them meet their living expenses, sometimes through advances, and later, by releasing his lien on their Grosse Pointe residence without insisting on payment. This last gesture allowed the Millers to retain approximately $12,000.00 in net sale proceeds in order to pay some bills. All in all, the evidence shows that Dr. Solomon has been abundantly compassionate toward the Millers.

When, by mid-2001, the Millers found themselves indebted to the Plaintiffs for fifteen separate financing transactions ranging in date from July 1987 to December 2000, in an amount approaching four million dollars, Dr. Solomon was beginning to show the strains of the relationship, and sought repayment of his money.  Though Dr. Solomon proposed payment terms, he was all too aware that any payoff depended solely upon Mr. Miller's success in completing the Governors Club project.

As a result, Dr. Solomon asked the Millers to sign a document on June 18, 2001, entitled "Miller Debt and Term Agreement" ("MDTA").  See Pl. Exh. 1.  This agreement identified and consolidated the fifteen loans owed by the Millers directly or as guarantors.  By signing the MDTA, the Millers acknowledged and renewed the debt, some of it over 10 years old, and agreed to certain provisions for interest and, more loosely, for security.  It also contained -- and omitted -- other significant terms.

For example, Dr. Solomon, the author of the agreement, insisted that before the Millers pay him, they first satisfy the claims of various family members and friends whom he felt obligated to protect and prefer.  In effect, Dr. Solomon subordinated his claims to the claims of other creditors identified in the "Miscellaneous" section of the MDTA.  The testimony from Dr. Solomon and Mr. Miller established that although the Millers made some payments to these enumerated friends and family, they never fully paid them, and therefore never paid Dr. Solomon.  In addition, the MDTA omitted a standard feature for an alleged post-default agreement, that being any provision wherein Dr. Solomon agreed to forbear from collection or suit.

Indeed, it is difficult to see from the MDTA or from the testimony at trial how the agreement benefitted the Millers in any meaningful way.  For example, the MDTA set the debt at

approximately $1,100,000.00 more than the $2,874,413.90 figure the Millers calculated in the March 30, 2001 letter. <u>See</u> Pl. Exh. 34. Moreover, the agreement provides for a punitive and nearly usurious default interest rate at 22%. Identified under the heading "Security" were several categories of property that Dr. Solomon evidently hoped to claim as collateral. For example, the agreement states that "All lots within the Governors Collection . . . shall be titled in Irwin Solomon's name with releases to be granted by Irwin Solomon upon sale, with said funds going to Irwin Solomon or his IRA." The agreement sought to encumber the Millers' personal residence and "all personal possessions," as well as 50% of their income "from any and all sources" until the debts had been paid in full. The MDTA did not bear the hallmarks of a lawyer's draftsmanship.

From the tenor of the MDTA, and its overreaching and unilateral terms, it would appear that Dr. Solomon's compassion for the Millers had come to an abrupt end. Yet, according to his trial testimony, about two months after the MDTA was executed, the Millers asked him to release his second mortgage on their residence so they could sell the home <u>and</u> retain the proceeds above the first mortgagee's loan. Dr. Solomon acceded to the request. As he testified at trial, he did this because they needed money to live on. Informally, he asked the Millers to grant him a mortgage on whatever home they decided to purchase next and they agreed to do so. When he later asked them to honor their agreement, Mr. Miller explained there was no equity in their new home and so no point in granting the mortgage. Again, Dr. Solomon relented.

The Millers' creditors, including Dr. Solomon, eventually lost patience and filed suit to collect their various debts. On February 27, 2008, the Millers filed a voluntary Chapter 7 bankruptcy petition.

#### IV. DEVELOPMENTS DURING THE CASE

Within 60 days after the first date set for the meeting of creditors, the Plaintiffs filed a complaint pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6), to except the Millers' debts from discharge.

On March 16, 2009, the Plaintiffs propounded paper discovery and Requests to Admit. After obtaining three extensions of the response deadline, the Defendants failed to respond, and the facts set forth in the Request to Admit were deemed admitted under Fed. R. Civ. P. 36.[5] Meanwhile, the Plaintiffs filed a Motion for Summary Judgment (the "Summary Judgment Motion") premised on their argument that the admissions fully satisfied all factual and legal proofs necessary for the entry of judgment against the Defendants with respect to the four agreements at the heart of the Plaintiffs' complaint.

Because the court was not permitted to draw inferences against the Defendants on the Summary Judgment Motion, however, it denied the motion, reasoning that although the deemed admissions established that the Defendants had no ability or intention to pay the debts mentioned in the four agreements, the admissions fell short of establishing that they intended to deceive the Plaintiffs. Therefore, in an Order dated October 13, 2009 (DN 45), the court further narrowed the issues for trial to whether the Defendants intended to deceive the Plaintiffs and whether the Plaintiffs justifiably relied on the Defendants' representations as required under 11 U.S.C. § 523(a)(2)(A). In addition, the court required Dr. Solomon to show that he paid the debt at issue in the Snider Payment Agreement, thereby incurring damages.[6]

At trial the Plaintiffs confined their request for relief to 11 U.S.C. § 523(a)(2)(A), abandoning claims under (a)(2)(B) and (a)(6).

---

[5] One week before trial, the Defendants filed a Motion to Withdraw Deemed Admissions, but the court denied the motion given the obvious prejudice that would have flowed from granting it on the eve of trial.

[6] The court also denied summary judgment on the Plaintiffs' claims under 11 U.S.C. § 523(a)(2)(B) and (a)(6).

The extended duration of the parties' relationship, with some transactions dating back to the late 1980s, complicated the Plaintiffs' presentation in court, and clouded their theory of the case.

On the one hand, their complaint mentioned fifteen supposedly fraud-tainted "promissory notes," some predating the MDTA by more than ten years. See Complaint at ¶7. Then, in their Summary Judgment Motion, they narrowed their case to four agreements post-dating 2000.[7] By the time of trial, however, presumably to counter the Defendants' statute of limitations defense, the Plaintiffs sought judgment only with respect to the MDTA and the Snider Payment Agreement, arguing that these transactions were forbearance agreements or "extensions" or "renewals" of credit within the meaning of 11 U.S.C. § 523(a)(2)(A). During trial, the Plaintiffs focused on their right to relief based upon the alleged fraud perpetrated by the Millers when they entered into the MDTA in 2001 and the Snider Payment Agreement in 2005. Even so, they never quite abandoned the notion that the entire relationship was infected with fraud because of the circumstances surrounding the fifteen original transactions, suggesting that the Millers took undue advantage of Dr. Solomon.

To make sense of this confusing presentation, the court entertained evidence surrounding the fifteen promissory notes enumerated in the MDTA, but only as part of the "totality of the circumstances" bearing on the Plaintiffs' justifiable reliance and the Defendants' intent to deceive in connection with the MDTA and the Snider Payment Agreement, the two main agreements the Plaintiffs relied on for their judgment of non-dischargeability at trial, and which the court now considers.

---

[7] Specifically, the four agreements at the heart of the Summary Judgment Motion included the MDTA, the Miller Solomon Modified Agreement, the Snider Payment Agreement, and the Miller Solomon Consulting Agreement.

## V.  THE MILLER DEBT AND TERM AGREEMENT

The Sixth Circuit has set forth the elements of a non-dischargeability case under 11 U.S.C. § 523(a)(2)(A) as follows:

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.  See Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir. 1993).

Rembert v. AT&T Universal Card Services (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998).   The Supreme Court requires the complaining creditor to establish its case by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 291 (1991).

A.    Reliance

As the Supreme Court has noted, the reliance element of a fraud case under 11 U.S.C. § 523(a)(2) is not difficult to establish.  Field v. Mans, 516 U.S. 59, 70 (1995) ("[T]he illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage."); Bank One, Lexington, N.A. v. Woolum (In re Woolum), 979 F.2d 71 (6th Cir.1992), cert. denied, 507 U.S. 1005 (1993) (reliance is not a rigorous requirement). The reliance element, like the intent to deceive element, depends on the totality of the circumstances.   Woolum, 979 F.2d at 75 (citing Boston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir.1992)).

The totality of the circumstances suggests that Dr. Solomon did not justifiably or actually rely on the Millers' representations in the MDTA.  Indeed, the principal evidence supporting

reliance is the inference to be drawn from the Defendants' deemed admission that they did not intend to abide by the MDTA when they signed it. Given the constellation of other facts adduced at trial, this deemed admission is too tenuous to support a finding of reliance.

First, Mrs. Miller's testimony plausibly suggested that, other than signing various documents, she was not a significant force in the transactions. Dr. Solomon himself took pains at points in his testimony to specify that he dealt principally with "Tom, not Denise." There is no evidence in the record suggesting that Dr. Solomon relied in any way on the statements or conduct of Mrs. Miller.

Nor is there meaningful evidence of Dr. Solomon's reliance on any specific fraudulent statements or actions of Mr. Miller. This is not a case in which the borrower misstated his financial condition, or even painted an unduly rosy picture of repayment prospects. To the contrary, Mr. Miller made Dr. Solomon aware of his dire financial picture only three months before he signed the MDTA, and highlighted the fact that all hope of repayment hinged upon the success of the Governors Club project, not on Mr. Miller's income or other personal resources. Dr. Solomon's testimony confirms he understood this. He also understood the toll the various lawsuits had taken on the project. Having heard the testimony and judged Dr. Solomon's demeanor at trial, the conclusion seems inescapable that he refrained from initiating suit not because of the MDTA, but because he was fond of the Millers and did not wish to jeopardize the Governors Club's success by initiating one more lawsuit that would distract Mr. Miller from completing the venture.

The court also notes that throughout the relevant period, Dr. Solomon had access to, and advice from, some of the finest commercial law firms in Michigan, including Seyburn, Kahn, Ginn, Bess and Serlin, P.C., and Honigman Miller Schwartz and Cohn LLP. Dr. Solomon's

sophistication and access to counsel are certainly not dispositive of the issue, but it is fair to consider these facts among the totality of other circumstances.

Most compelling, however, is that Dr. Solomon was the motivating force behind the MDTA. Indeed, but for the execution of that document, it seems likely that much of the debt, some of it dating back to 1987, would have been barred by statutes of limitation. Given that Dr. Solomon used retirement funds to finance the Millers and the various projects, and was concerned about tax penalties that he might suffer if he failed to promptly return the funds to the tax-favored accounts, it is not unreasonable to assume that the loans had short maturities, like the only note introduced at trial -- the $60,000.00 note related to a transaction with Charles Snider. This note had a two-month maturity date.    Dr. Solomon testified that he paid numerous tax penalties related to the retirement funds.

Though the court expected the Plaintiffs to introduce the various promissory notes into evidence, they did not. This left the court to speculate about the terms or even the existence of documentary evidence relating to the underlying debts recited in the MDTA. The parties appeared to have operated rather informally, given their friendship, so it is quite possible they did not sign formal notes, or the notes were lost over time. Regardless, the only documentary evidence of the Millers' debt before the court is the MDTA which is a simple summary and restatement of the debt, rather than a typical extension, renewal, forbearance, or refinancing agreement.

A forbearance agreement, for example, usually comes into existence at the behest of the borrower, after the lender threatens a collection action. Here, there is no meaningful forbearance term in the MDTA, and no evidence to suggest Mr. Miller persuaded Dr. Solomon to enter into the agreement. In fact, it is quite the reverse. Indeed, Dr. Solomon's lending practices were

premised on forbearance from the start.  Notwithstanding a portion of his testimony elicited after several leading questions on the subject, the court finds that Dr. Solomon did not change his position or practice because of anything the Millers did in connection with the MDTA.

Given the absence of any such evidence supporting reliance, other than the deemed admissions, the court finds Dr. Solomon did not rely on the Millers' representations in connection with the MDTA.

B.      Intent to Deceive

Many of the reasons expressed above regarding the reliance element also support a finding in the Millers' favor on fraudulent intent.  Because of the inherent difficulty in proving intent to deceive, the Sixth Circuit instructs trial courts to make this decision by drawing inferences from the "totality of the circumstances."  Rembert, 141 F.3d at 282.

The Millers' deemed admissions established they did not intend to perform, and they lacked the ability to perform, when they signed the MDTA.  Even so, the court opted to hear directly from the parties, so they could expound upon the admissions and offer documentary evidence regarding the Millers' intent to deceive.  Based upon the totality of circumstances, however, including the deemed admissions, the court finds that the record lacks evidence of other circumstances suggesting fraud, and concludes that Dr. Solomon did not establish an intent to deceive by a preponderance of the evidence.

First, neither of the Plaintiffs made any additional advances of "new money" reflected in, or as a consequence of, entering into the MDTA.  Even though "[a] contractual 'refinancing' or 'extension of credit' is sufficient without showing further damage,"[8] the fact that the Plaintiffs

---

[8] See Wolf v. Campbell (In re Campbell), 159 F.3d 964, 966-67 (6th Cir. 1998); Foley & Lardner v Biondo (In re Biondo), 180 F.3d 126 (4th Cir. 1999) (citing In re Campbell).

had already parted with $3,957,827.00 long before entering into the MDTA is relevant because it shows that the Defendants' had little to gain from entering into the agreement.  Indeed, as noted above, the MDTA did not appear to provide them any meaningful benefit, such as forbearance or debt forgiveness, or other factors tending to suggest that the Millers had any incentive to enter into the agreement. In many respects, the MDTA made them worse off, by reviving stale debts, acknowledging debt in excess of their own calculation, and imposing nearly usurious interest upon the inevitable default.  Mr. Miller knew the terms of the MDTA were unachievable, but he signed the agreement to accommodate Dr. Solomon.  Dr. Solomon initiated and drafted the MDTA, and the Millers merely responded.  It is difficult to infer an intent to deceive from a debtor's capitulation to his creditor's demands, particularly demands that provided no meaningful benefit to the debtor.

Both Dr. Solomon and Mr. Miller also knew collection activity in 2001 was not in either parties' best interests, at least not until Dr. Solomon persuaded Mr. Miller to revive and re-document the loans on terms that clearly favored the former.  Under the circumstances, Dr. Solomon would have refrained from suit with or without the MDTA in any event because, as he testified, he knew the success of the Governors Club project was his only hope of getting repaid. Indeed, rather than deceiving Dr. Solomon by making rosy predictions, Mr. Miller frankly reported various disappointments affecting the project, including a "Toll Brothers purchase offer falling through, a slowing economy, and four years of zero personal income."  <u>See</u> Pl. Exh. 34. The record clearly establishes that Dr. Solomon was painfully aware of the Millers' financial condition, having advanced funds to the Millers over the years to cover living expenses, when Mr. Miller was incarcerated, and later when the Millers were losing their residence to foreclosure in 2001.  These circumstances do not suggest an intent to deceive.

Plaintiffs offered no evidence that the Millers lived a lavish lifestyle at Dr. Solomon's expense, such as credit card statements or other evidence showing misapplication of funds, yacht or country club memberships, luxury automobiles, or other evidence of extravagant living that might have counted as circumstances evincing an intent to deceive. The Plaintiffs presented nothing like this.[9] The only facts offered that tended to suggest the Millers lived a lush lifestyle, were names of the towns in which they lived at different points in their lives: Grosse Pointe, Charlevoix, and Harbor Springs -- all places that enjoy a reputation for luxury. Yet, there was no evidence concerning the size or extravagance of the Millers' various residences, such as appraisals, photographs, waterfront locations, square footage, real property tax records, or even opinion testimony on value. Certainly, the court cannot take judicial notice that the Millers lived in luxury simply because of the towns in which they lived. Perhaps the Millers subscribe to the philosophy that it is better to "maintain an elegant address even if you have to live in the attic."[10]

As Defendants' counsel suggested in his closing argument, the record shows not a scheme by the Millers to defraud Dr. Solomon, but a commercial undertaking among friends whose mutual success depended on a risky real estate development in Okemos, Michigan. When the project was in its death throes, and Dr. Solomon was himself in desperate need of repayment, he persuaded the Millers to sign the MDTA, not *vice versa*.

For all of these reasons, the evidence does not support a finding that the Millers intended to deceive Dr. Solomon in connection with the MDTA.

---

[9] The court is aware the Defendants did not timely respond to the Plaintiffs' discovery requests. But, having reviewed the interrogatories and document requests and the history of this proceeding, the court concludes that the failure would not have made a difference  because (1) with minor exceptions, the Plaintiffs sought mostly information and documents that should have been within their own possession, custody, or control; (2) the Plaintiffs sought no discovery concerning the application or misapplication of loan proceeds over the years and any nexus to the Defendants' lifestyle; and (3) the Plaintiffs made no motion under Fed. R. Civ. P. 37 until the day before trial. The court largely granted that motion. See Plaintiffs' Motion to Strike Witness and Exhibit Lists (DN 52).

[10] Aristotle Onassis, My Secrets For Success, Success Unlimited Magazine, October 1970.

## VI.  SNIDER PAYMENT AGREEMENT

The evidence of fraud in connection with the Snider Payment Agreement, entered into in 2005, is similarly lacking.

Dr. Solomon offered no evidence connecting Mrs. Miller to the Snider Payment Agreement in any way.  She is not even a signatory to the document.  Mr. Miller, however, did sign the agreement individually and as a representative of North American Equities, Inc.  The agreement is actually a single sentence on the bottom of a one page document containing two agreements, and reads as follows:

> North American Equities, and or Thomas Miller personally, do hereby agree to accept total liability and to pay any and all money that may be awarded to the Plaintiff, in case number 05-066608-CK, Charles Snider, Plaintiff, vs. Irwin Solomon, Defendant, as noted in the BUSSEY-SOLOMON AGREEMENT at the top of this page.

Pl. Exh. 3.  Dr. Solomon's recollection of the origins of the transaction was dim.[11]  For reasons not fully explained, Dr. Solomon agreed to become indebted to Charles Snider, presumably as an accommodation to Mr. Miller or North American Equities, Inc., who needed to pay a sum certain to Mr. Snider, perhaps as a capital call in connection with the Governors Club project.  Later, after Mr. Snider commenced suit against Dr. Solomon, Mr. Miller acceded to Dr. Solomon's request for indemnification by signing the document in 2005.

However, Mr. Miller explained that this undertaking in 2005 was much more limited than Dr. Solomon may have believed.  Mr. Miller testified that he agreed to indemnify Dr. Solomon if there were a judicial determination of Dr. Solomon's liability to Mr. Snider.  However, if Dr. Solomon resolved the Snider lawsuit through negotiation, Mr. Miller wanted to be at the table.

---

[11] He initially testified that his role in the Snider transaction was that of creditor, rather than debtor, before counsel corrected him.  His confusion is understandable given the convoluted nature of the tripartite arrangement between Dr. Solomon and Messrs. Miller and Snider, and given the passage of time.

This understanding is consistent with the text of the Snider Payment Agreement. It also makes sense that someone like Mr. Miller, who obviously made the most of his powers of persuasion, would insist on being involved in any negotiation. Likewise, he would not want to become a party to the Snider-Solomon lawsuit, because he would have to pay counsel, but, if involved in negotiating a resolution, he could speak for himself and perhaps North American Equities, without incurring additional expense. This distinction between resolving the dispute through judgment as opposed to negotiation comported with the text of the agreement itself.

At trial, the testimony suggested that Dr. Solomon and Mr. Snider resolved their dispute in a negotiated settlement, and Dr. Solomon paid Mr. Snider approximately $97,000.00. Because the payment was the product of negotiation rather than adjudication, under the terms of the Snider Payment Agreement, as corroborated by Mr. Miller's testimony, Mr. Miller had no obligation to reimburse Dr. Solomon under that agreement. The Snider Payment Agreement was, for all practical purposes, a surety agreement, and Mr. Miller's obligations as surety must be tied to the agreement itself. The text of the agreement supports Mr. Miller's construction.

Because Mr. Miller did not ultimately incur a debt under the Snider Payment Agreement, there is no debt to except from discharge. Pearce v. Muncey (In re Muncey), 2009 WL 1651451 (Bankr. E.D. Tenn.). Accordingly, Dr. Solomon did not prove by a preponderance of the evidence a right to relief premised on the Snider Payment Agreement.[12]

VII. CONCLUSION

When the court learned the Plaintiffs had filed the Summary Judgment Motion premised largely on the Defendants' failure to respond to requests for admission under Fed. R. Civ. P. 36, the court assumed -- as Plaintiffs' counsel did -- that this case would easily be resolved in

---

[12] Because the court finds that the Plaintiffs failed to make their *prima facie* case, it is unnecessary to consider the Defendants' limitations defense.

Plaintiffs' favor.  Yet, the Sixth Circuit's admonitions that the court determine intent to deceive and reliance after considering the "totality of the circumstances," and the court's own predilection for deciding cases on the merits rather than procedural defaults, necessitated a trial notwithstanding Defendants' inability to meet many of the court's deadlines.

Indeed, this case illustrates the distinction between the Defendants' intent not to perform (established by the deemed admissions under Fed. R. Civ. P. 36), and Plaintiffs' right to relief more generally.  With respect to the MDTA, the document appears to have been cobbled together to revive stale claims, and both sides knew the Defendants were unable to honor it at the time it was executed.  Thus, the Defendants may not have intended to perform the MDTA when they entered into it, but neither did they intend to deceive Dr. Solomon by signing it.  With respect to the Snider Payment Agreement, even accepting the deemed admission that Mr. Miller did not intend to perform it, the court agrees with Mr. Miller's construction of the document, and finds that he did not breach it.  In other words, his failure to perform did not cause Dr. Solomon's loss.

Further complicating the Plaintiffs' burden were the passage of two decades since the parties first entered into many of the transactions under review; Dr. Solomon's poor health and hazy recollection of events; and the requirement that exceptions to discharge are construed in favor of debtors.[13]  After carefully considering the testimony and reviewing the documents admitted into evidence, the court concludes it is more likely than not that this matter arose from the failed business ventures of a skilled promoter and not the systematic bilking of Dr. Solomon.

Dr. Solomon is a generous and sympathetic gentleman, undoubtedly filled with regret that he permitted the Millers to take advantage of his good nature by repaying his repeated

---

[13] Manufacturer's Hanover Trust v. Ward ( In re Ward ), 857 F.2d 1082, 1083 (6th Cir.1988) (exceptions strictly construed).

kindness and indulgences with a bankruptcy discharge.  Yet, sympathy and regret are not enough to except debts from discharge.  Mrs. Miller's mindless acceptance of contractual obligations, proves foolishness rather than fraud; Mr. Miller's knack for gambling on his dreams with other people's money is not itself evidence of fraud, and is consistent with capital formation and real estate finance in our country.  In the absence of fraud, our society, our economic system, and our Bankruptcy Code, permit him to take such risks.

Having carefully considered the documentary evidence, the testimony, and the demeanor of the witnesses, the court finds the Plaintiffs have not met their burden under 11 U.S.C. § 523(a)(2)(A), and will enter a separate judgment for the Defendants, dismissing the complaint on the merits.

**IT IS SO ORDERED.**



Scott W. Dales
United States Bankruptcy Judge

**Dated: October 30, 2009**